IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, and IDAHO CONSERVATION LEAGUE, | ) ) ) ) Case No. CV-05-258-E-BLW |
| Plaintiffs, | ) **MEMORANDUM DECISION** ) **AND ORDER** |
| v. | ) ) |
| JERRY REESE, Supervisor, Caribou-Targhee National Forest, UNITED STATES FOREST SERVICE, an agency of the United States, and BUREAU OF LAND MANAGEMENT, an agency of the United States, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

_____)

**INTRODUCTION**

The Court has before it a motion for injunctive relief filed by Greater

Yellowstone and a motion to intervene filed by Simplot.  The Court heard oral

argument on August 1, 2005, and the motions are now at issue.  The Court will

grant Simplot's motion to intervene for remedy purposes only.  For the reasons

expressed below, the Court will deny Greater Yellowstone's motion for injunctive

relief.

**Memorandum Decision and Order – Page 1**

## FACTUAL BACKGROUND

Plaintiff Greater Yellowstone seeks to enjoin implementation of the South Manning Creek Exploration Project, a proposal to build roads and drill exploratory wells in the Caribou-Targhee National Forest and the Sage Creek Roadless Area. Greater Yellowstone claims that federal agencies violated the National Environmental Protection Act (NEPA) in approving this project.

Intervenor Simplot mines phosphate at its Smokey Canyon Mine, located partially within the Caribou-Targhee National Forest.  It leases land within the National Forest to mine phosphate.  Simplot seeks to expand the mine to include two new excavation areas known as Panel F and Panel G.  Panel F is also known as the Manning Creek proposal while Panel G is known as the Deer Creek proposal. Portions of both Panels are within the Sage Creek Roadless Area.

Simplot has leased most of Panel F, and all of Panel G.  Both the BLM and the Forest Service have jurisdiction over this area, and Simplot needs to obtain their approval before proceeding.  To determine if that approval should be granted, the BLM and the Forest Service began preparing an EIS, which is in the process of being completed.

On December 26, 2001, Simplot filed a lease modification application with the BLM to include the South Manning Creek area in the current Panel F lease.

The BLM responded in a letter dated December 17, 2002, stating that it would not "consider enlargement of the lease by modification at this time without further information."  The BLM required further information to answer two questions: (1) Whether sufficient phosphate deposits existed in that area; and (2) Whether water quality would be protected from toxic mining wastes.  In that letter, the BLM proposed that the information "can be gathered and is best authorized through an Exploration License" and "a jointly prepared NEPA document."        Simplot responded by proposing an exploratory project that would gather the information by (1) constructing about three miles of "temporary roads," (2) drilling 25 exploration holes ranging from 100 to 600 feet deep along with two groundwater monitoring wells, and (3) reconstructing 2,000 feet of previously reclaimed road. The project will last about one to two months.

        The BLM and Forest Service analyzed this proposal in an EA issued in final form in February, 2005.  In that EA, the agencies recognized that they had evaluated a similar lease modification request in 1997.  That 1997 proposal, also made by Simplot, included some of the same land included in its present proposal. Described in shorthand metes and bounds, the 1997 proposal included portions of lands in sections 26, 27, 34, and 35, the same sections where the present proposal will take place.  The match is not identical – the 1997 proposal included lands just

**Memorandum Decision and Order – Page 3**

south of the present proposal along with lands lying within the southern part of the present proposal.

In examining the 1997 proposal, the BLM consulted with the Forest Service and asked for its recommendation.  Forest Service Supervisor Jerry Reese responded to the BLM in a letter dated February 23, 1998.  In that letter, Supervisor Reese approves of leasing land to the north of the present proposal, but expresses concern about the lands at issue here due to the "sensitive nature and the importance of the surface resources present in [the area]."  He recommends against leasing lands lying in Section 26 – where most of the roads will be built in the present proposal – until "it can be demonstrated that there are phosphate reserve present in sufficient quantities to justify mining, and that selenium and other potentially toxic material can be controlled and the downstream effects mitigated to acceptable levels . . . ."  He also "strongly recommend against any phosphate leasing now or in the foreseeable future for lands within [Sections 27, 34, and 35]."

The 1997 proposal to lease lands in Sections 26, 27, 34, and 35, was eventually rejected by the agencies.  This history was recounted in the 2005 EA, which cited Supervisor Reese's concerns, and concluded that those concerns would be addressed by Simplot's exploratory project because the project would gather "geologic, hydraulic, and other environmental data . . . ."

**Memorandum Decision and Order – Page 4**

Recognizing also that the exploratory project would be conducted in the shadow of the much larger Panel F&G proposal, the 2005 EA conducted a cumulative impacts analysis. That analysis looked at the cumulative environmental impacts over the entire area of the Panel F&G proposal and beyond, an area labeled as the Cumulative Effects Area.

This analysis identified 4,300 acres of past, present, and future mining disturbances in the CEA, along with logging and grazing impacts. Examining the South Manning Creek Exploration Project in light of these surrounding impacts, the EA concluded that since "the Proposed Action would only temporarily disturb approximately 6.8 acres of soil, vegetation, and wildlife[,] . . . potential cumulative effects . . . within the [Cumulative Effects Area] would be inconsequential." The EA further found that the project's impacts would be "minimal and short-term."

On February 25, 2005, the Forest Service issued a Finding of No Significant Impact (FONSI), thereby declining to proceed with an EIS. This FONSI was issued by Supervisor Reese, the same person who in 1998 had expressed the concerns discussed above. In the FONSI, Supervisor Reese quotes from his 1998 letter identifying the need for more information on phosphate reserves and the protection of water quality. Supervisor Reese then concludes in the FONSI that approving the present exploratory project "will allow Simplot to gather the data

**Memorandum Decision and Order – Page 5**

needed for this evaluation."  *See* FONSI at p. 8.

Supervisor Reese goes on to list the following additional reasons for approving the project:  (1) the Revised Forest Plan (RFP) allowed for road construction and other activities incident to phosphate mining; (2) there was already an "extensive amount of human intrusion and activity" in the area; (3) the impacts of the exploration project were expected to be "minimal and short-term" because the project would last at most for two months and all roads would be "obliterated and reclaimed;" and (4) no mining activity was being approved – only limited exploratory work.  The FONSI also required that all disturbed areas "be stabilized using methods that have been provided in 'Best Management Practices' (BMPs) for Mining in Idaho," and adopted 25 measures to protect water quality.[1]

Simplot is set to begin the road-building sometime close to August 8, 2005. Greater Yellowstone brought this action seeking to enjoin the implementation of the project on the ground that its approval violated NEPA.

## ANALYSIS

1. <u>**Injunctive Relief**</u>

Greater Yellowstone is entitled to a preliminary injunction if it

---

[1]  It is undisputed that at the time the FONSI issued, the 2001 Roadless Rules governing Roadless Areas had been enjoined nationwide in *Wyoming v. U.S.*, 277 F. Supp. 2d 1197 (D. Wyo. 2003).  Those Rules were then supplanted by a 2005 Rule that allowed roads if consistent with forest plans.

demonstrates that it is likely to succeed on the merits and may suffer irreparable injury, or that serious questions exist on the merits and the balance of hardships tips in its favor. *See Self-Realization Fellowship Church v. Ananda*, 59 F.3d 902, 913 (9th Cir. 1995). The two tests are not separate but represent a sliding scale in which the required probability of success on the merits decreases as the degree of harm increases. *Id.* "Under any formulation of the test, the plaintiff must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985).

The Court will assume in this decision that the balance of hardships tips decidedly in favor of Greater Yellowstone. Thus, they need only raise serious questions on an issue to be entitled to injunctive relief.

## 2.   NEPA Standard of Review

An agency's decision not to prepare an EIS under NEPA is reviewed under the APA's arbitrary and capricious standard. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998). In determining whether the BLM's decision was arbitrary and capricious, the Court must ask whether the agency has taken a "hard look" at the environmental consequences of its proposed action. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir. 1998). Under this deferential standard, the Court will affirm an agency's decision that is "fully

informed and well-considered." *Id.*  However, the Court "must not 'rubber-stamp'

. . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate

or that frustrate the congressional policy underlying a statute." *Ocean Advocates v.*

*U.S. Army Corps of Engineers*, 402 F.3d 846, 858 (9th Cir. 2005).

**3.      Single EIS**

Greater Yellowstone argues that the agencies violated NEPA by failing to

consider the exploratory project in the broader EIS examining Panels F&G.  NEPA

may require a comprehensive EIS when "several concurrent proposals have a

cumulative or synergistic impact." *Earth Island Institute v. U.S. Forest Service*,

351 F.3d 1291, 1306 (9th Cir. 2003).  A single EIS is required if (1) there is a

single proposal governing the projects or (2) the projects are connected,

cumulative, or similar actions under the NEPA regulations.  *Id.*

Here, there is no single proposal governing the exploratory project and the

proposal to lease Panels F&G.  The former is a short-term project designed solely

to gather information, while the latter is a much larger project designed to mine

phosphate for many years.

The NEPA regulations state that actions are connected if one action

"[c]annot or will not proceed unless other actions are taken previously or

simultaneously."  40 C.F.R. § 1508.25(a)(1)(ii).  Here, the 2005 EA states that the

**Memorandum Decision and Order – Page 8**

monitoring groundwater wells in the exploratory project "have been proposed

. . . in order to gather hydrological baseline information for the Manning

Creek/Deer Creek (Panels F&G) Mine and Reclamation Plan."  *See* 2005 EA

at p. 2.  The EA goes on to note that "[f]ollowing the establishment of these wells,

sampling would take place in May and August of each year in order to collect

baseline hydrological information for the environmental analysis on the Mine and

Reclamation Plan submitted for the existing Manning Creek and Deer Creek

Leases."  *Id*. at p. 14.  The EA also states that the "subsurface geologic

information" gathered by the exploratory project would be "needed to evaluate

mining alternatives for the . . . Panels F&G EIS."  *Id*. at p. 32.

These provisions in the 2005 EA show that the information collected in the

exploratory project would be used in the Panel F&G EIS.  Counsel stated at oral

argument that one alternative being evaluated in that EIS included mining in the

South Manning Creek area.  Obviously, that alternative could not be considered in

the EIS without the information collected in the exploratory project.

That does not mean, however, that the Panel F&G proposal "[c]annot or will

not proceed" if the exploratory project is not approved.  There is no evidence in the

record that would support such a conclusion.  The area of South Manning Creek

that Simplot seeks to add to Panel F is very small in comparison to the existing

**Memorandum Decision and Order – Page 9**

Panels F&G.  It appears clear that the lack of exploratory information would not stop the Panels F&G EIS, but would simply prevent mining of the South Manning Creek area.  Thus, the Court cannot find that Greater Yellowstone has raised serious questions on the issue whether the two actions are connected under § 1508.25(a)(1)(ii).

Actions are also connected if one is an "[i]nterdependent part[] of a larger action and depend[s] on the larger action for [its] justification." *Id.* at § 1508(a)(1)(iii).  Here, the exploratory project does not depend on the Panel F&G projects for its justification.  While the information from the exploratory project may be used in the Panel F&G proposal, the exploratory project has a stand-alone purpose – gathering information to allow mining in the South Manning Creek area. The Court cannot find that Greater Yellowstone has raised serious questions on this issue.

A single EIS must also be prepared if the actions are "cumulative actions" under § 1508.25(a)(2).  An action is cumulative with another if "when viewed with [the] other proposed action [they] have cumulatively significant impacts . . . ." Considering the impacts in a single EIS will prevent an agency from "dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Thomas*

**Memorandum Decision and Order – Page 10**

*v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985).

In a recent decision, this Court found that the BLM had failed to issue a single comprehensive EIS evaluating the impacts of renewing grazing permits in the Jarbidge Resource Area (JRA).  *Western Watersheds v. Bennett*, Civ. No. 04-181-S-BLW (Memorandum Decision filed August 1, 2005).  Although the permits covered almost half of the JRA, the BLM divided the permits into four groups that were widely separated geographically, and then evaluated each group in a separate EA.  The Court found that this process violated the prohibition against dividing a single project into individually insignificant portions.

The Court would be concerned here if there were multiple exploratory projects, all evaluated in separate EAs, each with a separate cumulative impact analysis that stressed the small and short duration of each project.  That would be an attempt to improperly dilute the true impact of the projects.  That was not done here, however.  There is a single exploratory project, and it is accurately described as short and small.  It adds so little to the Panels F&G proposal, that it cannot be said to add a "cumulatively significant impact" to that larger proposal.  For these reasons, the Court cannot find that Greater Yellowstone has raised serious questions that the these actions are "cumulative actions" under NEPA.

Finally, § 1508.25(a)(3) requires that "similar actions" be addressed in a

**Memorandum Decision and Order – Page 11**

single EIS.  Similar actions are actions "which when viewed with other . . . actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  Here, the two actions are not similar – one is an exploratory project, small in scope, while the other is a mining proposal, large in scope.

Greater Yellowstone argues, however, that the exploratory project is "a mapping exercise intended simply to facilitate actual mining of the South Manning tract."  *See* Greater Yellowstone Reply Brief at p. 5.  Greater Yellowstone points out that the "exploratory" roads were placed by Simplot in the same location where Simplot had previously proposed roads for mining purposes.  Thus, according to Greater Yellowstone, this project is not exploratory in nature, but is rather designed to get Simplot in position to start mining as soon as possible.  The projects are therefore connected, Greater Yellowstone argues, because Simplot is using the South Manning project to set up its overall mining scheme.

The record, discussed above, does not support this argument.  Rather, the record shows that the agencies required Simplot to gather information before it would be allowed to mine the South Manning Creek area.  Supervisor Reese will not allow Simplot to proceed until it provides the necessary information.  Simplot is now complying with that request for information because it wants to mine the

**Memorandum Decision and Order – Page 12**

area.

For all of these reasons, the Court finds that Greater Yellowstone has not raised serious questions on its claim that a single comprehensive EIS should have been prepared.

**4.      NEPA Requires Cumulative Impacts Analysis**

"Even if a single, comprehensive EIS is not required, the agency must still adequately analyze the cumulative effects of the projects within each [NEPA document]." *Earth Island,* 351 F.3d at 1306.  An EA, just like an EIS, must contain a cumulative impact analysis. *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002).  A "cumulatively significant impact" is an impact on the environment that results from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  *Id.*  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005).

Moreover, in considering cumulative impacts, an agency must provide "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding

**Memorandum Decision and Order – Page 13**

why more definitive information could not be provided." *Id.* This cumulative analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id.*

Greater Yellowstone argues that the 2005 EA contains an insufficient cumulative impacts analysis. The Court cannot find, however, that Greater Yellowstone has raised a serious question on this issue. It appears from the 2005 EA, that the BLM and Forest Service have taken a "hard look" at the cumulative impacts.

The agencies began their analysis by describing a reasonably large CEA that took into account the past, present, and future mining. The conclusion of the agencies that this project is short in duration and small in scope is not unreasonable. The project will only last one or two months at most, and is insignificant in comparison to the mining proposal for Panels F&G. The EA reasonably reaches this conclusion by comparing the 6.8 acre footprint of the project to the 4,300 acres of disturbance from other projects. One of the main impacts of the project – the roads – will be "obliterated and reclaimed," according to the EA.

There are no more cumulative impacts to discuss; the EA covered them all. For these reasons, the Court cannot find that Greater Yellowstone has raised

**Memorandum Decision and Order – Page 14**

serious questions that the cumulative impacts analysis is insufficient.

**5.**     **Is a Separate EIS Required?**

NEPA requires that an environmental impact statement (EIS) must be
prepared for every "major federal action significantly affecting the quality of the
human environment." 42 U.S.C. § 4332(2)(C). If an agency decides not to prepare
an EIS, it must supply a "convincing statement of reasons" to explain why a
project's impacts are insignificant. *Blue Mountains*, 161 F.3d at 1212. "The
statement of reasons is crucial to determining whether the agency took a 'hard
look' at the potential environmental impact of a project." *Id.*

To prevail on a claim that an agency violated its statutory duty to prepare an
EIS, a "plaintiff need not show that significant effects will in fact occur." *Id.* It is
enough for the plaintiff to raise "substantial questions whether a project may have
a significant effect" on the environment. *Id.*

In making this determination, the Court relies on NEPA regulations,
promulgated by the Council on Environmental Quality ("CEQ"), to guide the
review of an agency's determination of "significance." *See* 40 C.F.R. § 1508.27.
Whether there may be a significant effect on the environment requires
consideration of two broad factors: "context and intensity." *See* 40 C.F.R.
§ 1508.27; 42 U.S.C. § 4332(2)(C). Context refers to the setting in which the

proposed action takes place. *Id*. at § 1508.27(a). Intensity means "the severity of the impact." *Id*. at § 1508.27(b).

These regulations contain a non-exclusive list of factors that the Court may consider in determining significance. The regulations direct the agencies to consider these factors, among others. The Ninth Circuit has held that one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances. *Ocean Advocates v. U.S. Army Corp of Engineers*, 402 F.3d 846 (9th Cir. 2005).

## 6.    <u>Uncertainty</u>

One of the "intensity" factors is "[t]he degree to which the possible effects on the human environment are highly uncertain . . . ." 40 C.F.R. § 1508.27(b)(5). "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data or where the collection of such data may prevent speculation on potential . . . effects. The purpose of an EIS is to obviate the need for speculation . . . ." *Ocean Advocates*, 402 F.3d at 870.

In this case, the Court cannot find uncertainties that would warrant collecting more data. The exploratory project is so short and small that its potential impacts can be readily ascertained. This factor does not apply here.

## 7.    <u>Reasonable Anticipation of Cumulatively Significant Impact</u>

**Memorandum Decision and Order – Page 16**

Another factor in evaluating "intensity" is whether "the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment."  40 C.F.R. §  1508.27(b)(7).  This language makes it clear that the Court need not find that cumulatively significant impacts actually exist so long as it is "reasonable to anticipate" that they exist.  However, as discussed above, it is not reasonable to anticipate that cumulatively significant impacts exist. This factor is likewise inapplicable.

## 8.    <u>Controversy</u>

Another factor is whether the "effects . . . are likely to be highly controversial."  *Id*. at § 1508.27(b)(4).  An action is controversial if "a substantial dispute exists as to its size, nature, or effect."  *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1122.  "The existence of opposition to a use, however, does not render an action controversial."  *Id*.  The lack of objection by other agencies is one factor that may be considered.  *Id.*

Here, there is no evidence that any agency has any objection to the exploratory project, and the BLM and Forest Service agree that it should move forward to collect the very information they need.  The record does not show evidence of a controversy beyond Greater Yellowstone's opposition, which is not

**Memorandum Decision and Order – Page 17**

enough by itself to render the project controversial.  This factor is also inapplicable.

**9.     Unique Area**

Finally, Greater Yellowstone argues that the action is significant because it affects a unique or sensitive resource or location.  40 C.F.R. §  1508.27(b)(3). Greater Yellowstone points to the 1998 letter of Supervisor Reese where he describes the area as sensitive with important surface resources.

The regulations require that the agency consider these factors – including the unique location – in evaluating intensity.  *Presidio Gold Club v. National Park Service*, 155 F.3d 1153, 1162 (9th Cir. 1998).  Here, the agency certainly considered this factor – it was Supervisor Reese who first identified the area as sensitive and expressed the need for more information, and it was Supervisor Reese who later approved of this project to get that information after citing his earlier concerns.  The agency appears to have taken a hard look at this factor, and the Court cannot find that Greater Yellowstone has raised serious questions on this issue.

**10.     Conclusion on Significance**

The agencies took a hard look at the context and intensity factors in this case.  The Court cannot find that any factor warrants an EIS here.  The mitigation

measures adopted by the agencies are also important in this analysis: An agency's decision to forego issuing an EIS may be justified by the presence of mitigating measures. *Friends of Payette v. Horseshoe Bend Hydroelectric Co.,* 988 F.2d 989, 993 (9th Cir. 1993). Here, the FONSI adopts a number of mitigation measures that will ensure water quality, one of the main concerns with a project such as this. That is another important factor in the Court's analysis.

**11.   Overall Conclusion**

The issues in this case have been difficult, and did not become any easier when all sides presented outstanding briefing and oral arguments. Proposals to build roads in national forests must be examined very carefully. Here, the BLM and Forest Service have conducted a very careful evaluation. They have adopted comprehensive mitigation measures designed to reduce adverse impacts. The project itself is short in duration and small in scope, involving only the collection of information rather than the mining of resources. Given the deference that is due an agency that has taken the requisite hard look at a project, the Court will deny Greater Yellowstone's injunction request.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for

**Memorandum Decision and Order – Page 19**

preliminary injunction (Docket No. 8) is DENIED.

IT IS FURTHER ORDERED, that the motion to intervene (Docket No. 3)
shall be GRANTED IN PART AND DENIED IN PART.  It is granted to the extent
that Simplot may intervene for purposes of litigating the remedy.  It is denied in all
other respects.

DATED:  **August 4, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision and Order – Page 20**